# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:14-cr-00083** |
| | ) | |
| **RICKY ANTHONY LANIER and** | ) | |
| **KATRINA LANIER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>DEFENDANTS' JOINT BRIEF FOR NEW TRIAL</u>

Defendants Ricky Anthony Lanier and Katrina Lanier, through counsel, respectfully submit this joint brief in support of their motion for a new trial at the conclusion of the *Remmer* Hearing and subsequent litigation due to the violation of their Sixth Amendment rights.[1]

## <u>SUMMARY</u>

For purposes of the Defendants' motion for a new trial for violation of their Sixth Amendment rights, which was the basis for the *Remmer* hearing ordered by the Sixth Circuit, the following factual summary is relevant:

At the trial of this matter, Juror 11 violated the Court's directives by calling ADA Nelson to discuss the case during jury deliberations, resulting in a *Remmer* hearing. Prior to the *Remmer* hearing, the Court ordered the jurors and ADA Nelson not to conduct research on the case or discuss the case with any other person. In violation of this Order, Juror 11 again contacted ADA

---

[1] At the conclusion of the April 18, 2019 hearing, the Court established a briefing schedule. D.E. 463, at 38-39. The Defendants' final briefs were due thirty days after the complete transcripts were filed by the Court reporter. *Id*. The transcripts were filed on June 7, 2019, making the deadline for filing the brief July 8, 2019. *See* Fed. R. Crim. P. 45(a)(1)(C) (extending a deadline that falls on a weekend to the next business day). On July 8, 2019, the Court issued an Order extending the deadline to July 9, 2019. D.E. 465.

Nelson to discuss the case. The Court learned that Juror 11 had done so—in violation of its clear Order—but failed to disclose this fact to Defendants prior to the hearing. At the *Remmer* hearing, Juror 11 lied about contacting ADA Nelson prior to the trial and lied again about contacting her prior to the *Remmer* hearing.

In response, Defendants sought a subpoena to prove that Juror 11 had lied at the *Remmer* hearing about the extent of her improper web research, but the Court unreasonably denied their request. After Defendants filed an emergency motion in the Sixth Circuit, the Court reconsidered their subpoena request but obtained data from Juror 11 in an objectively unreasonable manner, directing its law clerk and IT staff member (neither of whom had any special qualifications) to examine Juror 11's cell phone and computer. Although the Court's IT staff and law clerk discovered that Juror 11's relevant web history was missing, the Court did not inform Defendants of the apparent violation of its Order for six more weeks.

Following the discovery of Juror 11's deleted web browser history (her third violation of the Court's directives), the Court permitted further examination of her computer by a court-appointed expert but denied Defendants' request to examine her cell phone. While considering Defendants' requests about the manner and extent of the search, the Court had *ex parte* communications with the expert it appointed and failed to disclose these communications to Defendants.

After Defendants filed a motion to disqualify the Court due in part to these communications, the Sixth Circuit held that the Court had denied Defendants an adequate search of Juror 11's cellphone, which she had used to violate the Court's order by contacting ADA Nelson prior to the *Remmer* hearing. In light of the Sixth Circuit ruling, the Court again reversed course

2

and finally permitted Defendants to examine Juror 11's cell phone, but this proved futile; she had discarded it in the interim.

At a hearing on these matters, Juror 11 admitted that she had deleted her web browser history in violation of the Court's directives. In that same testimony, Juror 11 lied about why she had deleted her web browser history, claiming falsely that her company had directed her to do so. Finally, the Defendants' computer expert confirmed both that (i) Juror 11's web browser history was unrecoverable and (ii) the passage of time had made recovery of such data increasingly less likely.

The actions of Juror 11 and the Court have resulted in the need for a new trial in four independent ways:

*First*, Juror 11's actions demand a conclusion that external influence affected the jury's deliberations. The Sixth Circuit held in this case that misconduct by Juror 11 during the *Remmer* proceeding was "particularly probative" of whether she acted similarly during the trial and thus whether external influence affected the jury's deliberations. Juror 11 has violated a Court Order at least three times, including by deleting her web browser history, and lied under oath about her actions repeatedly. The Court should infer that she acted similarly at trial and caused external influence to affect the jury's deliberations.

*Second*, and in the alternative, the actions of Juror 11 and the Court have deprived Defendants of a meaningful opportunity to prove their claims. The Sixth Circuit has stated in this case that "failure to manage factfinding properly at this stage may permanently prejudice [Defendants'] ability to prove their claim." While Juror 11's misconduct has complicated the *Remmer* proceedings in this case, the Court has failed to properly manage the fact-finding, and thus permanently prejudiced the Defendants, by:

(i)     Not informing the parties when it learned that Juror 11 had again violated a Court Order by reaching out to ADA Nelson before the *Remmer* hearing, which prevented Defendants from trying to preserve her devices immediately;

(ii)     Not seeking to preserve Juror 11's web history and text messages and then denying the Defendants' requests to subpoena the same, which allowed her time to delete her web history and made it more likely that the deleted data would not be recovered;

(iii)     Ordering, without input from the parties, that the Court's IT staff attempt to collect the relevant data, which was retrieved in an objectively unreasonable way and allowed Juror 11 time to delete her web history and made it more it more likely that the deleted data would not be recovered;

(iv)     Waiting six weeks to notify the parties that Juror 11's web history had been deleted (she later admitted to deleting it), which made it more likely that the deleted data would not be recovered;

(v)     Failing to rule on, and later denying, Defendants' request to conduct a qualified search of Juror 11's cellphone, which gave Juror 11 time to discard the cellphone by trading it for a new one prior to the Court reversing its decision and allowing the search; and

(vi)     Restricting Defendants' unopposed proposed search parameters of Juror 11's computer after consulting *ex parte* with the Court-appointed expert, which further delayed the search for Juror 11's deleted web history.

*Third*, and in the alternative, Juror 11's actions show that there was external influence that affected deliberations. Juror 11 actively invited outside influence at trial by contacting ADA Nelson about deliberations, and the impact that the external influence had on Juror 11 alone is enough to demand a new trial. While we may never know the extent of her misconduct or the

4

external influence, it would be wholly unreasonable to conclude that the minimum amount of contact and research that she eventually admitted to was the sum total of the contact and research she had about the case during the course of trial and deliberations.

*Fourth*, and in the alternative, a new trial is required because Defendants were permanently prejudiced by the more than two-year delay between the trial and the *Remmer* hearing. This more than two-year delay prejudicially impacted Defendants' ability to obtain full and accurate information about the full extent and effect of the known external influence on deliberations.

## PROCEDURAL AND FACTUAL BACKGROUND

1.     *Juror 11 violated the Court's Order at trial by calling ADA Nelson to discuss jury deliberations, resulting in a* **Remmer** *hearing.*

During the trial of this matter, after the presentation of the evidence, the jury deliberations occurred from December 14 to December 17, 2015. D.E. 196-199. On December 17, 2015, at 9:55 a.m., the Court held a hearing in chambers, during which it informed counsel that it had received a telephone call that morning from an assistant district attorney ("ADA") in Sullivan County saying "that she had gotten a phone call from one of our jurors this morning." D.E. 212, 3:10-12. The Court described the interaction as follows:

> This juror [Juror 11] is a friend of this ADA. She indicated that there was, to use the ADA's words, quote "a problem with the deliberations." And she said, when I heard that, I said, whoa, whoa, you cannot talk to me about this. Don't say anything more. If there's something going on, you need to call it to the judge's attention; and her response was something like, well, I don't really know how to do that. And she said, tell the court officer, tell the clerk, tell somebody, you need to communicate that to the judge. So that was, that was the phone call I got this morning.

D.E. 212, 3:18 - 4:3. The jury returned with their verdicts around 10:40 a.m., finding Ricky Lanier and Katrina Lanier guilty on only four and three of the 20 counts against them, respectively. D.E. 199, 212.

5

Although defense counsel moved for a new trial and sought to question the jurors about Juror 11's phone call, the Court declined to do so and later barred counsel from speaking with the jurors. *United States v. Lanier*, 870 F.3d 546, 548-49 (6th Cir. 2017).

The Court's refusal to conduct a hearing was the subject of the direct appeal, and the Sixth Circuit remanded for a *Remmer* hearing. *Id.* at 551. The Sixth Circuit found that Juror 11 "actively invited outside influence[,]" and noted:

> The prosecution argues that, because the district judge announced that Nelson asserted that she refused to discuss the case with the juror who contacted her, there is no suggestion of external influence on the juror. *We cannot agree.* Whether or not Nelson acted appropriately, *the juror acted inappropriately* in seeking outside input on the case. And because no one has ever questioned any member of the jury, *we do not know the extent of the juror's misconduct* in contacting third parties and discussing the case with outsiders or what impact the juror's misconduct involving extraneous communications had on the rest of the jury.

*Id.* at 550 (emphasis added). In ordering the hearing, the Sixth Circuit instructed that "attorneys for each side should have the opportunity to question Juror 11 and the rest of the jury to determine whether any external influence affected the jury's deliberations." *Id.* The court also retained jurisdiction over the cases. *Id.*

**2.    Prior to the Remmer *hearing, the Court ordered the jurors and ADA Nelson not to conduct research on the case or discuss the case with any other person.***

Following remand, this Court held a status conference on October 2, 2017 (D.E. 318) to discuss the process and procedure for the *Remmer* hearing. D.E. 319. At that status conference, defense counsel emphasized the importance of the jurors not having contact with anyone, or engaging in any research, about the status of this case in advance of the hearing. On October 11, 2017, the Court issued its Order Regarding Attendance of Jurors, which was served on all of the trial jurors by the U.S. Marshals. D.E. 322. The Order specifically incorporated the instructions requested by Defendants, instructing jurors that "[a]lthough the Court recognizes that you may

6

have questions about this subpoena and Order, you must not discuss your jury service or this case with any other person between now and the date of the forthcoming hearing on January 11, 2018." *Id*. at ¶ 2. The Order went on, instructing all the jurors that they "... must not (i) contact any other jurors who may have served with you in this case, or (ii) any other individual who has knowledge about the case." *Id*. at ¶ 3. The Court also instructed the jurors and ADA Nelson not to conduct research or otherwise seek information about the case. *Id*. at ¶ 4.

On December 11, 2017, due to concerns that the Court might have to testify at the *Remmer* hearing because of his prior handling of *ex parte* contact with the prosecutor, Defendants filed a Joint Motion for Disqualification of Judge Greer from presiding over the hearing. D.E. 324: Joint Mot. For Disqualification. Just over a week before the January 11, 2018, *Remmer* hearing, the Court denied Defendants' motion. D.E. 331: Mem. Op. and Order.

**3.** ***Prior to the* Remmer *hearing, Juror 11 again violated the Court's Order by contacting ADA Nelson to discuss the case.***

On January 11, 2018, consistent with the process agreed upon at the October and November status hearings, the jurors were held in the courtroom neighboring the Court's courtroom, with court officers or U.S. Marshals present to ensure that they did not communicate orally. ADA Nelson was sequestered apart from the jurors in a room behind the courtroom. Notably, none of the jurors were informed by the Court or the parties that ADA Nelson was present at the hearing or had been subpoenaed to attend, and ADA Nelson testified that, "to my knowledge [Juror 11] would not have known I was even subpoenaed or even was going to be here or that I am here [at the January 11 hearing]." Exhibit 1: Transcript of Excerpt of January 11 hearing at 71.[2]

Unbeknownst to the Defendants—but not the Court—Juror 11 had violated the Court's Order before the hearing by again contacting ADA Nelson, just as she had done at trial. Ex. 1: Tr.,

---

[2] Because the exhibits to this brief contain sealed materials, they are being filed separately and under seal.

7

at 12. Fortunately, during the *Remmer* hearing, defense counsel stumbled upon Juror 11's most recent misconduct during his questioning of ADA Nelson. Ex. 1: Tr., at 12. ADA Nelson reported that she received a text message from Juror 11 in the week leading up to the *Remmer* hearing, stating that she (Juror 11) had looked online and found information about the case and asked the prosecutor if she knew what the "*Remmer* Hearing" was about. *Id.* at 12, 62-63.[3] ADA Nelson also testified that, when she received the text message, she immediately called the Court for guidance and was directed by the district judge, through the Court's courtroom deputy, not to respond to Juror 11. *Id.* at 68-69. Following the Court's spoken and off-the-record directive, ADA Nelson did not respond to Juror 11's question. *Id*. The next day, Juror 11 again contacted her to solicit information about the hearing. *Id.* at 65-66.[4]

**4.      *Prior to the* Remmer *hearing, the Court learned that Juror 11 had violated its Order by contacting ADA Nelson but failed to disclose this fact to Defendants.***

ADA Nelson contacted the Court to report the Juror 11's violation of its Order, just as she had done at trial. Ex. 1: Tr., at 12. Unlike at trial, however, the Court did not inform the Defendants when it learned that Juror 11 had violated its Order. Exhibit 2: Affidavit of Defense Counsel, ¶ 1. Nor did the Court inform the Defendants that ADA Nelson had contacted it seeking guidance about how to respond to text messages sent to her by Juror 11 about the upcoming *Remmer* hearing. *Id.*

---

[3]      The text of the first text message from Juror 11 to ADA Nelson read, in pertinent part:

I have a question for you. The federal case I was I juror on two years ago, I have received a summons to report to [Greeneville] this Thursday. When I looked online that is what is listed 2:14cr83JRG (LF) Remmer Hearing – Ricky Lanier et al. Does any of that lead you to know what in the world this is about two years later [emoji]? Tha

[4]      The text of this text message from Juror 11 to ADA Nelson read, in full: "Did you see the second part of my original text on the federal case?"

In fact, the Court said nothing at all to the parties about these matters and began the hearing without alerting defense counsel to these highly relevant facts. *Id.*

Thus, the Court failed to inform defense counsel of Juror 11's misconduct at any time before, during, or after the hearing. Ex. 2: Aff. ¶ 1. Nor did the Court explain on the record why it had directed the action of ADA Nelson and failed to disclose to defense counsel that Juror 11 had violated its Order, even in the face of the recusal motion raising this issue. Instead, the Court simply explained in response that it had made a "decision to allow the new information [about Juror 11's misconduct] to be revealed at the hearing, rather than a few days prior." Contrary to this bare assertion, however, there is no suggestion in the record that the Court intended for the defendants to learn this information or took steps to ensure that it was disclosed to them. Nor did the Court take any steps to ensure that defense counsel could use the information effectively at the *Remmer* hearing to question and, if necessary, impeach Juror 11.

### 5. *At the* **Remmer** *hearing, Juror 11 lied about contacting ADA Nelson prior to the trial.*

After defense counsel discovered Juror 11's most recent misconduct through ADA Nelson's testimony, Defendants requested that Nelson retrieve her cell phone, which she said still contained the text message she received from Juror 11. Ex. 1, Tr. at 40. Before, and after, Nelson provided the parties with the text message, Juror 11 testified under oath, and was questioned about her behavior both during trial and immediately prior to the *Remmer* hearing. Ex. 1: Tr. at 43-60. She repeatedly lied. Her testimony was contradicted by both the testimony of ADA Nelson and the documentary evidence—including the text messages she sent to Nelson.

For example, Juror 11 lied at first about having any contact with Nelson at all during the trial deliberations. Specifically, she testified as follows:

Q:     Okay. Besides your husband, did you express these frustrations to anyone else?

9

A:     Not, not to my knowledge, <u>no</u>.

Q:     Okay, so you don't recall being frustrated about it and telling that to anybody else that period during the trial or deliberations?

A:     <u>No</u>; That I recall, <u>no</u>.

Q:     Okay. Besides your husband, was there anyone else you spoke to about the trial in any capacity?

A:     In regards to --

Q:     Anything.

A.     -- The specifics or -- again, <u>not that I recall</u>. It's been so long ago, I don't, I don't remember exactly.

(Ex. 2: Tr. at 53) (emphases added).

Later, after acknowledging that she had spoken with someone about the trial—the call to ADA Nelson during deliberations—Juror 11 lied about the content of their conversation. Specifically, she testified in part as follows:

A:     I did call a friend of mine on the way here one, one time and express my concern over the length of it and how stressed I was.

       . . .

A:     Well, I was just with -- we both understood we couldn't talk about the case, <u>I was just expressing my concern over the length of it and how stressed I was</u>; and she just gave me what a friend would say and said, it will be fine and don't worry about it, and, you know, it will be over soon; that's basically all she said.

       . . .

A:     I didn't talk to her about specifics. I called her as a friend because she was a lawyer and I knew she had been through this, and I thought she -- and I was, I was stressed, and I thought she could give me some just friendly advice on and keep me going as I was driving down here. It was a brief conversation; and I even remember saying, I said, Teresa, if I'm, you know, if I'm saying something I'm not supposed to, please, you know. And she said, no, you're fine, I can talk to you just, you know, in general stuff; and we didn't talk about any of the specifics of the case, we just talked about how stressful it was.

10

Ex. 1: Tr. at 53,54, 91 (emphasis added). This testimony was simply untrue.

ADA Nelson testified that Juror 11 told her that she (Juror 11) had concerns about jury deliberations, "something to the effect of, there's a case, I'm on a jury, generally there's something, there's some issue, some problem, some something that's happening, and I don't know what I need to do; and you're a lawyer, so I'm calling you, kind of thing." Ex. 1: Tr. at 23 (emphasis added). Nelson testified she told Juror 11 that "whatever goes on in the jury room is private and that can't be discussed. I know you don't know that, but it just, I can't discuss this with you." Ex. 1: Tr. at 21. ADA Nelson's testimony was corroborated by this Court's recitation of what ADA Nelson stated when she first spoke to the Court on the morning of December 17, 2015.

### 6. *In that same testimony, Juror 11 lied about contacting ADA Nelson prior to the* **Remmer** *hearing.*

In addition to these false statements during the *Remmer* hearing, Juror 11 also lied in her testimony about:

(i)     contacting ADA Nelson prior to the *Remmer* hearing; and

(ii)    seeking ADA Nelson's advice as to what the *Remmer* hearing was about.

As to the first lie, Juror 11 initially testified that she did not talk to anyone other than her co-workers and family about the *Remmer* hearing. In relevant part, she testified as follows:

Q:     Okay. And did you abide by that order to not talk to anybody?

A:     <u>Yes</u>, I mean, other than letting my workers and family know that I had to go back.

Q:     Okay. Did you try to contact anybody else about being here today?

A:     Not to my memory, <u>no</u>.

Q:     Did you ask anybody any questions about being here today?

A:     <u>No</u>.

Ex. 1: Tr. at 57-58 (emphases added).

11

Later, when recalled to the stand, and after persistent questioning by defense counsel, Juror 11 slowly began to leak half-truths about her contact with ADA Nelson. In relevant part, she testified as follows:

Q:     Okay. Was that the last conversation you had with Ms. Nelson was that Thursday?

A:     I texted her over the weekend to see if her, her older daughter were both sick with the flu and to see if they were okay.

Q:     Just checking on her, things like that?

A:     <u>Yes</u>.

Q:     Did you ever have any other communications besides friendly check-ins with Ms. Nelson?

A:     You mean over the last two years?

Q:     Just over the last two weeks.

A:     <u>I did because I couldn't remember – I couldn't find my papers or anything</u>. I did go online to just the, the court to see what time we were supposed to be here, what day and that; and I sent her the little initials and stuff to see if that meant anything to her, that you know, I was supposed to have or anything because I didn't find the, I couldn't find the paperwork; but she didn't respond to that, and I took it, because it was on the back end of I hope you all are okay, and in my business, you all probably are well aware too, when you send e-mails or texts to people, they usually answer the first thing, they don't read all the way through. So I didn't take much to it, other than she didn't see it.

(Ex. 2: Tr. at 77-78) (emphases added).

Juror 11, not knowing that defense counsel now had a copy of her text messages to ADA Nelson, continued to lie about the substance of the messages. Before being confronted with the text messages themselves, Juror 11 testified as follows:

Q:     And so what did you ask Ms. Nelson about any of that?

A:     If any of those initials that are on the thing meant anything that I should be, you know, aware of before I came.

Ex. 1: Tr. at 79.

12

Q:      Okay. So you were trying to confirm that it was still on. Did you ask Ms. Nelson if this hearing was still on?

A:      No.

Q:      What did Ms. Nelson have to do with this?

A:      Just because she's an attorney, I thought she might know what those initials meant if I needed to know anything prior to, you know, being here.

Ex. 1: Tr. at 81.

A:      <u>It was just to confirm where I needed to be and what I needed to do</u>.

Q:      So why would you ask then Ms. Nelson about where you have to be?

A:      Just like you would have any friend that has an expertise in a certain field, if she had – if she you know, understood anything else I needed to do, I just wanted to make sure I was prepared, since I couldn't find the paperwork.

Ex. 1: Tr. at 83-84 (emphasis added).

A.      About the specific of the case. I wasn't asking that, I was just asking anything I needed to do.

Q:      [Juror 11], I guess -- and so she -- was she able to give you any information as to where you had to be or --

A:      No.

Q:      And did you ask her --

A:      No.

Q:      -- Any questions --

A.      <u>I didn't ask her anything further</u>. I have not spoke with her since, text or otherwise.

Q:      I guess just very clearly what was the extent of what you asked her in this, is it a phone call or was it a voicemail?

A:      It was a text, and I said, I hope you and [your daughter] are both feeling better, they both had the flu. And I said, I don't know if you remember, but I was on that federal case a couple years ago, and they've asked me to come back, and here's the little CR, whatever it said, and does that -- <u>Do I need to do anything special to</u>

13

<u>your knowledge</u> for that. And she just replied, thanks, that they both felt better, and she didn't reply to the second part.

Ex. 1: Tr. at 84-85 (emphases added).

> Q: So did you ask Ms. Nelson, you know, what's this about, what am I doing here, why do I need to be here?
>
> A: <u>No</u>.
>
> Q: You didn't want to find out why in the world they sent you the subpoena?
>
> A: <u>No</u>.
>
> Q: You didn't want to know that?
>
> A: I'm sorry?
>
> Q: Did you not want to know why you were subpoenaed to come here today?
>
> A: I didn't have any inkling on why we were here. <u>I just wanted to know if there was anything I needed to do or have with me because I couldn't find the paperwork</u>.
>
> Q: So I'm asking specifically, you did not reach out to Ms. Nelson and say, hey, what the heck is this about?
>
> A: <u>No, I did not say that</u>.

Ex. 1: Tr. at 87-88 (emphases added).

But that is <u>exactly</u> what Juror 11 asked ADA Nelson. Defense counsel confronted Juror 11 with her first text message, which clearly seeks information about the nature of the proceeding. The message did not, as Juror 11 claimed, seek information about where to report, what time to report, what to bring, or how to prepare for the hearing. In relevant part, Juror 11 testified as follows:

> Q: Could you read [the text] aloud?
>
> A: Hope you and [child] are much better. I have a question for you, the federal case I was a juror on two years ago, I have received a summons to report [ ] to Greeneville this Thursday. When I looked online, this is what was listed. <u>Does any of that lead</u>

14

<u>you to know what in the world this is about, two years later</u>. Sorry I didn't recall I said that.

Ex. 1: Tr. at 88 (emphasis added).

> Q:     Okay. What was the reason that you asked her this time this week information about this case?
>
> A:     Just because she was a friend and I thought she, like I said, she would know. If there was any information she could, you know, tell me that, about the case -- or not the case, but about what I needed to do or why, you know, we were going, that she would offer that information.
>
> Q:     Did you have any concern that you would need to do something in particular, that there was something about this proceeding today that involved you?
>
> A:     No, just curious, I guess, just, you know, wanted to make sure I was prepared.

Ex. 1: Tr. at 93.

**7.     *Defendants sought a subpoena to prove that Juror 11 lied at the* Remmer *hearing, but the Court unreasonably denied their request.***

In response to Juror 11's testimony, which immediately appeared suspect for the reasons detailed above, Defendants requested that the Court order Juror 11 to preserve her web browsing history for the two weeks prior to hearing, and certain text messages sent during the week prior to the hearing. Ex. 1: Tr. at 96-101. At that time, the Court agreed and orally directed Juror 11 to preserve this information. Ex. 1: Tr. at 101. After receiving this instruction, Juror 11 left the witness stand and, as she did so, began to cry. Ex. 2: Aff. at 2.

At the close of the testimony, the Court asked the Defendants to submit any motion for the issuance of a subpoena for Juror 11's data as soon as possible, requiring that it be filed by 9:00 a.m. the Tuesday following the Thursday afternoon conclusion of the hearing and the Martin Luther King Holiday; Defendants filed their motion and request for a subpoena two business days later. Ex. 1: Tr. at 101; D.E. 335, 336.

15

In their post-hearing motion, Defendants requested that the Court permit them to issue a subpoena for Juror 11's web browsing history for the two weeks before the hearing and for certain text messages containing a small number of key words (such as "jury," "hearing," "Remmer," and "judge") that Juror 11 sent or received within a week of the hearing. D.E. 335, 336. The government filed a response in opposition to this request, (D.E. 338, 339), and the Court issued an Order denying the issuance of the requested subpoena shortly thereafter. D.E. 340.

After the Court denied Defendants' motion, Defendants filed an emergency motion to compel or, in the alternative, a petition for a writ of mandamus before the Sixth Circuit. The Sixth Circuit denied the motion because, in the interim, this Court ordered Juror 11 to produce the requested data. D.E. 346.

In denying the motion, however, the Sixth Circuit stated the following:

> We note that although "the district court ha[s] considerable discretion in determining how to investigate" the Laniers' colorable claim of extraneous influence, the defendants must be provided a "meaningful opportunity" to investigate and prove their claim. *United States v. Harris*, No. 17-3087, slip op. at 10-11 (6th Cir. Feb. 5, 2018) (internal quotation marks omitted). Evidence that Juror 11 failed to comply with the district court's order prior to the Remmer hearing, conducted prohibited outside research, and then testified untruthfully about her actions would be particularly probative of determining the credibility of her testimony that she did not conduct herself similarly during the trial itself, and thus whether external influence affected the jury's deliberations."

**8.     *After Defendants filed an emergency motion in the Sixth Circuit, the Court reconsidered their subpoena request but obtained data from Juror 11 in an objectively unreasonable manner.***

The Sixth Circuit's order came after this Court reversed its prior position and ordered, *sua sponte*, that Juror 11's devices be collected by the Court's information technology ("IT") staff. D.E. 345. Although the Court reconsidered its prior Order and decided to compel Juror 11 to disclose text message information and web browsing history, it never sought guidance from the parties about how the relevant information from Juror 11's computer should be retrieved, nor did

16

the Court take any steps on the record to ensure that the IT staff member it ordered to undertake the task had any qualifications that would enable him to do so.

Pursuant to the Court's Order, and without the parties present, the IT staff member, David Belcher, met with Juror 11 on February 16, 2018, to retrieve data from Juror 11's cell phone and laptop computer. Tr. of Hr'g, at 5, Apr. 11, 2018. The Court's law clerk was also present alongside Mr. Belcher to work to extract the information. *Id*. at 6-7. There is no evidence in the record that the Court's law clerk was qualified to extract data from a laptop computer or cellular phone. To retrieve information off Juror 11's computer and cellular phone, the pair took photographs of the computer's screen and the cellular phone's screen using the devices' built-in screen-capture software. *Id*. at 7, 12-19. The parties were not made aware of this methodological choice for retrieving the relevant information, nor were they made aware that the court's law clerk would be present for the inspection of Juror 11's computer. Had they been, Defendants would have objected to this procedure on the grounds described in their expert's subsequent affidavit. D.E. 382-1: Kempvanee Aff.

**9.       *Although the Court's IT staff and law clerk discovered that Juror 11's relevant web history was missing, the Court did not inform Defendants of the apparent violation of its Order for six more weeks.***

Even through this technologically deficient search, Mr. Belcher and the Court's law clerk discovered that Juror 11's browser search history only went back eight days before the day the devices were collected. Tr. of Hr'g, at 8, April 11, 2018. That is, although the Court directed Juror 11 at the close of the *Remmer* hearing on January 11, 2018, to preserve her web history for the month of January, none of that history was present on the computer when it was viewed on February 16, 2018. The short duration of available web history was also inconsistent with how such history is generally stored. On this point, the Court's IT staff member later testified that

"generally a browser will have a default amount of time to go back, and I believe 60 days, 90 days." *Id*. at 9. Despite the Court being aware of the apparently deleted web history on February 16, 2018, when its law clerk and IT staff observed the missing data, the Court did not notify the parties of the apparent deletion until it convened a telephonic status conference on April 2, 2017— nearly *six weeks* later. D.E. 352: Minute Entry.

Just over a week after that telephonic status conference, the Court held a hearing where the parties could question the court's IT staff member responsible for collecting Juror 11's devices about extracting the data from the devices. After questioning Mr. Belcher, the Court finally permitted the parties to review what he had observed on Juror 11's devices two months before.

**10.**      *Following the discovery of Juror 11's deleted web browser history (her third violation of the Court's directives), the Court permitted further examination of her computer but denied Defendants' request to examine her cell phone.*

Because of the apparent deletion of Juror 11's browser history, defense counsel requested that the Court permit a defense expert to examine the devices in hopes of recovering deleted data. Tr. of Hr'g, at 22-23, 32, Apr. 11, 2018. The Court denied that request and, instead, stated that it would appoint an expert to examine the devices and create a report. *Id*. at 32. The Court offered the name of such an independent expert, Mr. Derek Johnson, a former federal law enforcement investigator, to conduct the independent examination. *Id*. at 31-32. The Court then asked the parties to provide the Court with "the specific things that the expert is requested to do." *Id*. at 32.

On April 17, 2018, the Court issued an Order granting Defendants' request for a forensic examination of Juror 11's computer; it did not rule on Defendants' same request for an examination of her cell phone. D.E. 374. In that Order, the Court stated that it had "secured an independent forensic expert to conduct the imaging and evaluation processes," although the Order did not name the expert or officially appoint him. *Id.* This expert estimated the cost for imaging and examination

18

of the devices to be $4,000. *Id.* The Court ordered Defendants to pay the full cost of this examination and directed them to make a deposit of $4,000 into the court. *Id.* The Court concluded by noting that "[t]he parameters of this examination have yet to be determined" and ordered "the parties [to] file their proposals for the parameters of Juror 11's computer and cell phone" within two days. *Id.*

Defendants complied with the Court's Order. On April 19, 2018, Defendants filed their Proposal for Parameters of the Analysis of Juror 11's Computer and Cell Phone. D.E. 375. The same day, the United States informed the court that it had no objection to the search parameters proposed by Defendants, except that the United States did oppose a forensic examination of Juror 11's cell phone. D.E. 376.

**11.     *While considering Defendants' requests, the Court had* ex parte *communications with the independent expert it appointed and failed to disclose those communications to Defendants.***

Unbeknownst to the parties, the Court and the Court's law clerk consulted with Mr. Johnson about Defendants' motion between the time it was filed and the time the court ruled on it, and relied on multiple substantive communications with him in denying portions of the Defendants' unopposed request. Defendants only learned of this *ex parte* contact through an invoice attached to a court Order. D.E. 383-1. In it, Mr. Johnson revealed that, on April 21, 2018, two days after the parties submitted their search protocols, he did an "evaluation" of the "[s]earch parameters" for one and a half hours. *Id.* The next day, on April 22, 2018, he "consult[ed] with the court regarding search parameters" for a half hour. *Id.* Then, the next day, April 23, 2018, he received a "[t]elephone call from [the court's law clerk]" which amounted to a "consultation regarding search parameters" that took another hour. *Id.*

19

None of these interactions was known to Defendants at the time. Nor did the Court make any subsequent notification to the parties about these conversations before issuing his Order denying recusal. The only reason Defendants stumbled upon Court's *ex parte* communications with Mr. Johnson was by reviewing the invoice they received from Mr. Johnson because his charges to the Defendants were almost double his initial estimate, which required him to provide an invoice to Defendants to document the time he spent working on the examination. *See* D.E. 383-1. In other words, had the expert's invoice been less than the $4,000 Defendants had already deposited into the court's registry, Defendants never would have received notice of these *ex parte* communications.

Three days after the Court's last undisclosed *ex parte* communication with Mr. Johnson about the parties' proposals for searching Juror 11's computer and cell phone, the Court issued an Order significantly limiting Defendants' requested search parameters—parameters to which the government had agreed. D.E. 377. In this Order, the Court (i) denied Defendants' request to conduct a qualified forensic search of Juror 11's cell phone; (ii) appointed Derek Johnson to "conduct a forensic imaging and evaluation of Juror 11's laptop computer;" (iii) "f[ound] that the majority of the requests made by the defendants in their proposal are overbroad, irrelevant, and unworkable;" (iv) set its own "parameters for a proper search of Juror 11's laptop computer;" and (v) notified the parties that Mr. Johnson was specifically authorized to contact Juror 11's employer and the court's IT staff member about his work. *Id*. Nowhere in the court's Order did the Court reveal that he had forwarded Defendants' proposed search parameters to Mr. Johnson, consulted at length with Mr. Johnson about Defendants' request, and crafted his own parameters with input from Mr. Johnson. On the contrary, the Order's reference to authorizing Mr. Johnson to speak with

specific individuals suggests that Mr. Johnson had not spoken substantively about this matter with anyone else, including the Court or the Court's law clerk. *Id.*

With no knowledge of Mr. Johnson's involvement in the court's denial of its requests through *ex parte* conversations, Defendants subsequently filed a motion to reconsider the limitations the Court imposed. D.E. 382. In doing so, Defendants included an affidavit of their own expert, explaining the need for the more detailed parameters they sought, and to which the Government had assented. D.E. 382-1: Kempvanee Aff.

On May 24, 2018, shortly after learning of the *ex parte* communications from Mr. Johnson's invoices, Defendants filed a Renewed Joint Motion for Disqualification based on (i) the Court's withholding of evidence favorable to Defendants that he learned through *ex parte* contacts and (ii) the Court's substantive *ex parte* communications with the court-appointed expert.[5] D.E. 387. The Court set the hearing for oral argument, D.E. 390, and oral argument was heard on June 26, 2018. D.E. 394. At this hearing, the Court questioned defense counsel extensively about his response to the Court's withholding of evidence rather than provide any further information to the parties about why it occurred. Tr. of Hr'g on June 26, 2018, at 13-18. Similarly, the Court asked a series of hypothetical questions about its *ex parte* contact with the court-appointed expert without providing any substantive information about what had actually occurred. *Id.* at 5-13, 24-29. Only later, in its memorandum denying the recusal motion, did the Court for the first time disclose the extent of his *ex parte* contacts with the expert. D.E. 396, at 6-7.

Defendants also moved the Court to reconsider its order regarding the forensic examination of Juror 11's cellphone and computer. The Court denied, without explanation, Defendants' motion

---

[5]     Defendants contemporaneously filed under seal their Motion for Appointment of a New Expert and to Reconsider Fee Order. D.E. 389. The Motion requested the disqualification of Mr. Johnson as a forensic expert and reconsideration of the court's Order requiring additional payment to expert due to his *ex parte* communications with the court.

with respect to Juror 11's cellphone. D.E. 377. Defendants later moved for reconsideration of the Court's Order denying the forensic examination of Juror 11's cellphone, D.E. 382, which the Court also denied. D.E. 398.

**12.      *After Defendants' filed a motion to disqualify the Court due to these communications, the Sixth Circuit held that the Court had denied Defendants an adequate search of Juror 11's cellphone.***

Defendants then petitioned the Sixth Circuit for a writ of mandamus to compel this Court to recuse itself. *See* Order of the Sixth Cir. Sept. 9, 2018. In denying the writ, the Sixth Circuit stated that "the district court has *denied the defendants an adequate search* of Juror 11's cellphone without adequate explanation." *Id.* (emphasis added).

**13.      *In light of the Sixth Circuit ruling, the Court again reversed course and finally permitted Defendants to examine Juror 11's cell phone, but this proved futile; she had discarded it in the interim.***

This Court held a hearing where the court-appointed expert testified about the examination of the computer that he conducted. He testified consistently with his report, which stated that it appeared "the Chrome browser history and cache were cleared manually on or about 2/7/2018." D.E. 391. Defendants' expert testified at the hearing about what other steps could be done to recover relevant data, including deleted text messages. Following that hearing, this Court granted Defendants' request for forensic imaging and evaluation of Juror 11's cellphone used between the dates of December 27, 2017 and February 7, 2018, citing the Sixth Circuit's directive to "provide defendants with a meaningful opportunity to investigate their claim." D.E. 418. Unbeknownst the Court and the parties, however, Juror 11 was no longer in possession of the cellphone. D.E. 422-21.

Defendants filed a Joint Motion to Vacate Further Proceedings and Order a New Trial, arguing that Defendants are permanently deprived of a meaningful opportunity to prove their

claims now that Juror 11 no longer had the cellphone. D.E. 425. This Court denied it. D.E. 440. Defendants' expert was permitted to forensically image Juror 11's computer and performed a "google takeout" in an attempt to recover the deleted data. At least in part because the passage of time, the deleted web history was not recovered. Ex. 3: Tr. of Hr'g, at 17-31.

14. ***At a hearing on these matters, Juror 11 admitted that she had deleted her web browser history in violation of the Court's directives and lied about why she had deleted her web browser history.***

A final hearing took place on April 18, 2019, and Defendants subpoenaed Juror 11 to testify. Juror 11 confirmed that she indeed failed to preserve the cell phone that she was supposed to be preserving under the Court's order by trading it in for a new phone in March of 2018. Ex. 3, at 6-7.

Juror 11 was then asked whether she deleted her web browser history (in violation of the Court's order). She said "No," but that she would have only deleted web history "if [her] company asked [her] to." She went on to say that her computer belongs to her employer and that "they sometimes do an automatic thing, and it deletes everything." *Id*. at 8. When asked specific questions about her employer's apparent web browser deletion policy, Juror 11 stated that her company asks its employees to delete web browser history "when [her employer] think[s] there's a virus or something, they'll have us [delete web browser history]. . ."[6] *Id.*

When pressed for further details about this, Juror 11 stated she did not recall the timing of the events and does not "recall if [her company] had [her] do that right prior to the judge's order." *Id.* at 8-9. She did claim to recall, however, that she received an email from her employer requesting her to delete her browser history. *Id*. at 9. Juror 11 said she was "sure that's happened"

---

[6]      She went on to testify that she "think[s] at the time when they asked for information, [she] told whoever that [her] company had just requested that right prior to you requesting or somebody requesting [her] information. *Id.* "They" presumably refers to someone with the U.S. Marshals Service or the Court.

but could not say whether "she did it and disregarded the judge's order purposefully or not purposefully." *Id*. at 10.

Juror 11 was then asked whether she did more web searches prior to the initial *Remmer* hearing than she disclosed at the initial hearing. *Id*. at 10-11. She said she did not have the best memory and had "no recollection of exactly what [she] did on certain days" and that she couldn't say whether she did further research prior to the *Remmer* hearing than she had previously disclosed. *Id*. at 11. She did recall, however, speaking again with ADA Nelson about this case in the weeks following her testifying at the initial *Remmer* hearing. *Id*. at 14-15. She understood from speaking with ADA Nelson that Defendants' counsel had concerns about her communications with ADA Nelson. *Id*.

**15.** ***At that same hearing, the Defendants' expert confirmed that Juror 11's web browser history was unrecoverable and that the passage of time made recovery increasingly less likely.***

Mr. Joe Morelli, the expert who conducted the forensic imaging of Juror 11's laptop, also testified. *See id*. at 17. He testified to the following facts and conclusions:

(i) Forensic imaging of cell phones and computers are done in the ordinary course of his work as a digital forensic technician. He testified that software tools exist that are capable of recovering deleted browser history, depending on how long it has been deleted and other factors. He testified that the software his company uses, Cellibrite, which is common in the industry, has the ability to recover deleted text messages.

(ii) Mr. Morelli further testified to what a "google takeout" is and how it can be used to recover web browser history.

(iii) He testified that he performed a google takeout on Juror 11's computer and did not recover the deleted history.

(iv) Mr. Morelli testified that upon finding that the google takeout recovered no history, he checked her google account settings and found that "she had the option to save search history disabled on her account."

24

(v)     Mr. Morelli created a google account as a test account to see if that was a default setting and found that google's default setting for save web history is "enabled" or turned on by default. Mr. Morelli concluded that someone had turned that setting off on Juror 11's computer.

(vi)    Mr. Morelli then testified that he has never heard of IT staff directing an employee to delete web history from one of their browsers because of concerns that web history may have infected he computer. He testified that it was not plausible.

*Id.* At 17-35.

Based on Juror 11's testimony that her work had asked her to delete emails, Defendants requested, and were permitted, to subpoena her employer, Lamar Advertising, to produce "[a]ny email sent by a Lamar employee to the work e-mail address of [Juror 11], another Lamar employee, from January 11, 2018, through February 8, 2018, that requests or advises her to delete web browser history from her work computer. *See* D.E. 460. On May 16, 2019, counsel for Lamar Advertising phoned the Court Clerk's office to response to the subpoena. D.E. 460. Counsel informed the case manager that Lamar Advertising had no documents responsive to the subpoena. *Id*. The case manager requested Lamar Advertising to respond to the subpoena in writing. *Id*. It did so, writing that the company "conducted an email search on the account of [Juror 11] using the search terms "delete web browser history." *Id*. The search resulted in no responsive documents. *Id*.

## **ARGUMENT**

### I.      **Defendants' Sixth Amendment Rights To An Impartial Jury Were Violated By The Participation of a Dishonest Juror Who Repeatedly Violated the Court's Orders.**

On remand, the Sixth Circuit directed the Court to hold a *Remmer* hearing to determine what happened during deliberations in this trial, including the nature and extent of improper external influences that may have impacted the jury deliberations. As set forth above, the testimony of one of those jurors concerning her own conduct has been called into question. Juror 11's lies,

25

and repeated, willful, disobedience of this Court's orders, have undermined the integrity of the fact-finding process.

This is no small issue. The Sixth Amendment guarantees criminal defendants an impartial, indifferent jury. *See, e.g.*, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976). "The bias or prejudice of even a single juror would violate the right to a fair trial." *See, e.g.*, *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977). In order to know whether bias or prejudice occurred, jurors must be honest in answering questions, particularly questions that target their own adherence to the court's rules when the juror's actions are under the microscope.

"If a juror is found to have deliberately concealed information, bias may be inferred." *United States v. Patrick*, 965 F.2d 1390, 1399 (6th Cir. 1992). This is, in part, because "[a] juror . . . who lies materially and repeatedly in response to legitimate inquiries [by the Court] introduces destructive uncertainties into the process." *Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir.) (*en banc*), *cert. denied*, 525 U.S. 1033 (1998) (regarding a juror's lies during *voir dire*). In *Dyer*, the Ninth Circuit described how juror untruthfulness undermined the integrity of the trial process itself:

> There is, of course, the possibility that [the juror lied] because of some personal bias against the defendant which she managed to hide from the court. But a perjured juror is unfit to serve even in the absence of such vindictive bias. If a juror treats with contempt the court's admonition to answer *voir dire* questions truthfully, she can be expected to treat her responsibilities as a juror—to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions—with equal scorn. Moreover, a juror who tells major lies creates a serious conundrum for the fact-finding process. How can someone who herself does not comply with the duty to tell the truth stand in judgment of other people's veracity? Having committed perjury, she may believe that the witnesses also feel no obligation to tell the truth and decide the case based on her prejudices rather than the testimony.

*Dyer*, 151 F.3d at 983.

This reasoning is not only sound, but it has been adopted by multiple lower and appellate courts. In *United States v. Daugerdas*, for example, a juror lied about her background multiple times during *voir dire*. 867 F.Supp.2d 445 (S.D.N.Y. 2012). In response, the trial court held that "[t]he brazenness of [the juror's] deliberate lies and her demonstrated inability to distinguish truth from falsehood added destructive uncertainty to the fact-finding process . . . Accordingly, this Court concludes that [she] was impliedly biased." *Daugerdas*, 867 F.Supp.2d at 474.

The trial court went on to say the juror's "defiance of the Court and its orders, as well as her statements at [two hearings], betray a fundamental contempt for the judicial process" before concluding that "[s]uch a person has no business sitting on a jury in judgment of others." *Id*. at 475-76. The *Daugerdas* court noted that the Second Circuit had never found a reason to overturn a verdict on the basis of juror nondisclosure. The court reasoned, however, that the juror's conduct "warranted such extraordinary relief." *Id*. at 468. On appeal, the Second Circuit agreed and affirmed, holding that "the record amply supports the findings of the district court." *United States v. Parse*, 789 F.3d 83, 111 (2d Cir. 2015). The appellate court "ha[d] no difficulty with the ruling of the district court in the present case that the jury empaneled to hear the case against these defendants was not an impartial jury." *Id*.

The same question is present here—it was the question the Sixth Circuit sought to have answered on remand. "[M]aterial and repeated lies" can "introduce destructive uncertainties into the process," *Dyer*, 151 F.3d at 983, and Juror 11 has exhibited a remarkable willingness to lie about the extent of her misconduct both during trial and before the hearing and violate the Court's orders. The text messages that Juror 11 sent ADA Nelson included language ("Remmer hearing") and other information that was only available on the internet. Juror 11's evolving and contorted explanations for why she sent the text message and how she obtained that information strongly

suggest that her internet research was not as limited as she claimed. Moreover, Juror 11's behavior after being told by the trial court to preserve her web history and text messages—becoming visibly upset and beginning to cry—suggests that she was concerned that even more of her dishonesty would be revealed. Juror 11 was adamant that the only research she had done was to visit the trial court's website to check on scheduling matters. This reasoning was not consistent with the text message itself, nor did her evolving explanation for lost (and then found) paperwork make sense. Nor is it consistent with her deleting her web browser history and discarding her cell phone.

Without the opportunity to obtain the requested information about Juror 11's internet history and text messages, Defendants were deprived of the ability to examine the full extent of her misconduct. Regardless, the evidence before the Court, including the testimony of ADA Nelson, the testimony of Juror 11, and the text messages sent from Juror 11 to ADA Nelson, made exhibits to the January 11 hearing, D.E. 336, collectively show that Juror 11 was and is unwilling to tell the truth, whether under oath or not. ADA Nelson's testimony showed that when she spoke with Juror 11 on December 17, 2015, she told Juror 11 that she needed to inform a court officer or similar person about whatever the problem was with deliberations. This was consistent with the Court's directions to the jury. Not only did Juror 11 not inform anyone at the Court of the problems about which she called ADA Nelson during deliberations, but she also testified at the *Remmer* hearing (1) that she did not tell ADA Nelson there was any problem with deliberations, a fact about which ADA Nelson was adamant, and (2) that ADA Nelson did not even tell her to take any action at all.

Juror 11's unwillingness to respect the rules of law, and this Court, was even more apparent when she again contacted ADA Nelson, this time in advance of the *Remmer* hearing, and in direct contravention of this Court's Order, to ask specifically if ADA Nelson had any information about

28

the *Remmer* hearing. Juror 11 further violated the Court's Order by going onto the internet to research the hearing. No other juror testified to having done so, despite each of the jurors receiving an identical Order. Juror 11 flouted the Court's orders and authority by both contacting someone about the matter at hand, just as she had during deliberations over two years prior, and by looking up the case online. After all of that, as described in detail above, Juror 11 saw fit to blatantly lie under oath about each and every one of the times that she violated the Court's rules, in an apparent attempt to conceal her actions. She then deleted her web browser history in violation of the Court's Order, provided a false explanation under oath as to her actions, and discarded her cell phone.

The Sixth Circuit held in this case that "[e]vidence that Juror 11 failed to comply with the district court's order prior to the *Remmer* hearing, conducted prohibited outside research, and then testified untruthfully about her actions would be particularly probative of determining the credibility of her testimony that she did not conduct herself similarly during the trial itself, and thus whether external influence affected the jury's deliberations." Order of Sixth Cir., February 15, 2018, at 4. Juror 11 did all of these things—and more. She violated the Court's order at trial by reaching out to ADA Nelson during deliberations. She continued her misconduct throughout the *Remmer* process by failing to comply with this Court's Order prior to the Remmer hearing. She conducted prohibited outside research. She then testified untruthfully about her actions. She also deleted her web browser history and discarded her cellphone. Under the Sixth Circuit's February 15, 2018, Order in this case, Juror 11's actions are particularly probative of how she conducted herself during the trial and lead to the conclusion that external influence affected the jury's deliberations. *See id*.

Put simply, Juror 11's actions "betray a fundamental contempt for the judicial process," and show that she "ha[d] no business sitting on a jury in judgment of others." *See Daugerdas*, 867

F.Supp.2d at 475-76. Her "material and repeated lies" irreparably impaired the fact-finding process both at trial and during the *Remmer* hearing, *see Dyer*, 151 F.3d at 983, and Juror 11's bias against the Defendants must be inferred.

## II. Defendants Are Entitled To A New Trial Because They Did Not Receive A Meaningful Opportunity to Investigate and Prove Their Claim of Extraneous Influence.

When a *Remmer* hearing is necessary, "due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury." *Ewing v. Horton*, 6th Cir. Case No. 17-2485, Feb. 5, 2019, Slip Op. at 5. The Sixth Circuit has noted that the "failure to manage factfinding properly at this stage may permanently prejudice the Laniers' ability to prove their claim." Order of Sixth Cir., Sept. 6, 2018, at 6 (citing In re Jones, 680 F.3d 640, 642 (6th Cir. 2012). Juror 11's behavior, along with the Court's managing of the factfinding, have permanently prejudiced the Laniers' ability to prove their claim in the following ways:

*First*, before the initial *Remmer* hearing, Juror 11 violated the district court's Order by again contacting ADA Nelson, just as she had done at trial. Ex. 1: Tr., at 12. ADA Nelson contacted the district court to report the violation, just as she had done at trial. *Id*. Unlike at trial, however, the court did *not* inform the Defendants when it learned that Juror 11 had violated its Order. Ex. 2: Aff. ¶ 1. Nor did the district court inform the Defendants that ADA Nelson had contacted it seeking guidance about how to respond to text messages sent to her by Juror 11 about the upcoming *Remmer* hearing. *Id.* In fact, the district court said nothing at all to the parties about these matters and began the hearing without alerting defense counsel to these highly relevant facts. *Id.* Instead, the Court simply explained in response that he made a "decision to allow the new information [about Juror 11's misconduct] to be revealed at the hearing, rather than a few days prior." Contrary to this bare assertion, however, there is no suggestion in the record that the Court intended for the

30

defendants to learn this information or took steps to ensure that it was disclosed to them. This prejudiced Defendants because, had the Court notified the parties of Juror 11's misconduct, Defendants could have sought preservation and a subpoena for the relevant records expeditiously *before the hearing*, just as they did when they learned of the misconduct at the hearing.

*Second*, at the close of the testimony, at Defendants' request, the trial court ordered Juror 11 to preserve all web history on her computers and text messages on her cell phone. Ex.1: Tr., at 101-02. Notably, despite being made aware of the existence of communications between Juror 11 and ADA Nelson that violated its Order, the trial court never sought to obtain or preserve those messages until Defendants requested that it do so. The trial court subsequently asked Defendants to submit any motion for the issuance of a subpoena for Juror 11's computer and cell phone data as soon as possible; Defendants filed their motion and request for a subpoena two business days later. *Id*. at 101; D.E. 335: Joint Mot. For Permission to Issue Subpoena; D.E. 336: Ex. and Witness List. In it, Defendants requested a subpoena for Juror 11's web browsing history for the two weeks before the hearing and for certain text messages containing a few key words (such as "jury," "hearing," "*Remmer*," and "judge") that Juror 11 sent or received within a week of the hearing. D.E. 335-1: Ex. A; D.E. 336. The Government responded in opposition to this request, (D.E. 338; D.E. 339), and the court issued an Order denying the issuance of the requested subpoena. D.E. 340. This prejudiced Defendants because Juror 11 later admitted to deleting web browser history around this time. Defendants would have been able to recover Juror 11's web browser history if it had not been deleted at that time. If she already had deleted it, which would have coincided with her learning from ADA Nelson that Defendants were concerned about her prior communications, the passage of time caused by the Court's denial made it less likely that the deleted data would ever be recovered.

31

*Third*, after this Court denied Defendants' requested subpoena, Defendants sought emergency relief from the Sixth Circuit asking that the Court permit the issuance of the subpoena. After reviewing Defendants' Sixth Circuit Emergency Motion, this Court reversed its prior decision and ordered, *sua sponte*, that Juror 11's devices be collected by the court's information technology ("IT") staff. D.E. 345. The trial court never sought guidance from the parties about how the relevant information from Juror 11's computer should be retrieved, nor did the trial court take any steps on the record to ensure that the IT staff member it ordered to undertake the task had any qualifications that would enable him to do so. As a result, the data was retrieved in an objectively unreasonable and insufficient way—by taking photographs of the computer's screen and the cellular phone's screen using the devices' built-in screen-capture software. Tr. of Hr'g, at 5-19, April 11, 2018. The parties were not made aware of this methodological choice for retrieving the relevant information. Had they been, Defendants would have objected to this procedure on the grounds described in their expert's subsequent affidavit. D.E. 382-1: Kempvanee Aff. This would have saved valuable time.

*Fourth*, even through the technologically deficient search, it was discovered that Juror 11's browser search history only went back eight days before the day the devices were collected. Tr. of Hr'g, at 8, April 11, 2018. That is, although the trial court directed Juror 11 at the close of the *Remmer* hearing on January 11, 2018, to preserve her web history for the month of January, none of that history was present on the computer when it was viewed on February 16, 2018. The short duration of available web history was also inconsistent with how such history is generally stored. On this point, the court's IT staff member later testified that "generally a browser will have a default amount of time to go back, and I believe 60 days, 90 days." *Id*. at 9. Despite the court being aware of the apparently deleted web history on February 16, 2018, when its law clerk and IT staff

32

observed the missing data, the court did not notify the parties of the apparent deletion until it convened a telephonic status conference on April 2, 2017—nearly *six weeks* later. D.E. 352. In the interim, more valuable time to recover the deleted web history had passed.

*Fifth*, when the Court issued an Order granting Defendants' request for a forensic examination of Juror 11's computer, it did not rule on the same request for Juror 11's cellphone. The Court later denied, without explanation, the Defendants' request to conduct a qualified forensic search of Juror 11's cellphone. A subsequent motion to reconsider the denial of the cellphone search went unanswered. When the Court finally allowed Defendants to conduct a forensic examination of the cellphone pursuant to the Sixth Circuit's directive, many months had passed since they first sought the records. It was too late. Juror 11 had discarded her cellphone. This permanently prejudiced Defendants' ability to find and prove the extent of Juror 11's misconduct.

*Sixth*, the Court, after communicating *ex parte* with its expert, and based upon those communications, did not accept the Defendants' proposed search parameters. The Sixth Circuit was troubled by this. At the subsequent hearing, Defendants' expert testified about what steps could be done to recover relevant data beyond what the Court's expert had done, which would not have recovered the deleted web history. By the time Defendants were permitted to have their expert take a forensic image and do a google takeout of her computer, nothing could be obtained. Juror 11 had already deleted it.

The Court's failure to manage factfinding properly, coupled with Juror 11's willful defiance of Court orders, has made it impossible to prove the extent of Juror 11's misconduct. Because Juror 11 had additional contact and conducted research prior to the hearing, the full scope of which Defendants are not aware, the integrity of the *Remmer* process was called into question,

and Defendants did not have a full and fair opportunity to exercise their rights to such hearing. There is no telling what would have been found on the search history or web browser history that Juror 11 deleted. The fact that no one can know—Defendants, this Court, the Sixth Circuit—establishes the need for a new trial. As a result, the Defendants' ability to prove their claims has been permanently prejudiced. *See* Order of the Sixth Cir., Sept. 6, 2018.

### III. Defendants Are Entitled To A New Trial Because The Nature Of Juror 11's Conduct And Mistruths Demand A Finding That External Influence Initiated By Juror 11 Impacted Her During Deliberations.

Defendants are also entitled to a new trial based upon the fact that the Court must find that external influence affected Juror 11 during the deliberations. The Sixth Circuit remanded this case in order to conduct a *Remmer* hearing to determine whether "any external influence affected the jury's deliberations." *United States v. Lanier*, 870 F.3d at 551. The substance of the communications between Juror 11 and ADA Nelson are at the heart of the potential "external influence" that may have "affected the jury's deliberation." *See id*. at 550 ("There is no question that the third-party contact in this case was intentional and improper because the juror intentionally contacted the third party, [ADA] Nelson, in order to discuss the case with her.").

The Sixth Circuit further pointed out: "Unlike in most other cases of third-party contacts, the juror in this case was not the passive target of someone else's attempt to influence the jury. The juror in this case actively invited outside influence." *Id.* The Sixth Circuit made clear that the purpose of the *Remmer* hearing was to find out "the extent of the juror's misconduct . . . or what impact the juror's misconduct involving extraneous communications had on the rest of the jury." *Id.* (emphasis added). The court directed that, "[s]ubject to review by [the Sixth Circuit panel], if the *Remmer* hearing reveals that any external influence prejudicially affected jury deliberations, defendants are entitled to a new trial[.]" *Id.* at 551.

34

Juror 11's testimony at the January 11 hearing demonstrated that she had "actively invited outside influence" beyond what was known at the time the Sixth Circuit reviewed this matter in the first instance. Juror 11's (i) lies about the substance of the conversation she had with ADA Nelson on the final morning of deliberations, (ii) lies about having contacted ADA Nelson later, (iii) research on the internet about the case in 2018, (iv) relinquishment of the cellphone containing the text messages she was orally ordered to preserve, and (v) deleted web browser history and implausible (and, even if true, not helpful) explanation that she deleted it because her employer asked her to result in the inescapable conclusion that Juror 11 could have, and likely did, expose herself to external sources beyond ADA Nelson. Juror 11's repeated unwillingness to follow the Court's instructions or to respect the Court's authority, even when under oath, only add fuel to the fire. It would be wholly unreasonable to conclude that the minimum amount of contact and research that she eventually admitted to was the sum total of the contact and research she had about the case during the course of trial and deliberations. The fact that Juror 11 steadfastly refused to offer a fully truthful explanation for her conduct injects manifest uncertainty into what outside influences she exposed herself to (beyond the known external influence of ADA Nelson) during deliberations.

Moreover, the mere fact that Juror 11 may not have exposed other jurors, in turn, to these external influences, does not mean that Defendants' verdict should stand. The impact that an external influence may have had on Juror 11 alone is enough to demand a new trial. *See Remmer v. United States*, 350 U.S. 377, 381-82 (1956) (finding a new trial warranted when one juror was approached and influenced from the outside, where there was no indication he shared that information with other jurors during deliberations); *Fullwood v. Lee*, 290 F.3d 663, 678 (4th Cir. 2002) ("if even a single juror's impartiality is overcome by an improper extraneous influence, the

accused has been deprived of the right to an impartial jury"). Of course Juror 11's willingness to lie and disobey court orders means that there is no way to ever know whether an external influence impacted her deliberations or not. Even if Juror 11 were to admit exposure to other external influences beyond ADA Nelson, her steadfast unwillingness to testify truthfully would call into question any assertion that they did not affect her deliberations, and vice versa. Thus, the Court can, and should, conclude that Juror 11 voluntarily sought out other extraneous information—in the form of conversation with others in addition to ADA Nelson about the case and/or by conducting research about the case online or otherwise—which prejudicially impacted her deliberations in this case.

## IV. Defendants Were Prejudiced By The Two-Year Delay In Holding The *Remmer* Hearing And Are Entitled To A New Trial

Jury deliberations in this case took place in December of 2015. As the Sixth Circuit found, the Court erred in not holding a full and fair *Remmer* hearing after it learned of the contact between Juror 11 and ADA Nelson on December 17, 2015. The *Remmer* hearing did not take place until January 11, 2018, over *two years* after deliberations and Juror 11's inappropriate contact with ADA Nelson took place. At the hearing, the jurors were asked whether their memories of the details of the trial and deliberations would have been more accurate in late 2015 than the January 2018 hearing confirmed that his or her memory would have been fuller and more accurate.

This more than two-year delay prejudicially impacted Defendants' ability to obtain full and accurate information about the full extent and effect of the known external influence on deliberations—Juror 11's call to ADA Nelson—much less any unknown external influences that may have also occurred. Had the hearing been held in a timely manner, immediately upon ADA Nelson's first call to this Court, the jurors and ADA Nelson would have been able to testify in a more accurate and fulsome manner. As such, Defendants suffered irredeemable prejudice caused

by the delay in holding the hearing, which prevented them from fully exploring how deliberations were impacted by the external influence that Juror 11 exposed herself to, whether she or other jurors were exposed to any other external influences, and whether Defendants' rights to a fair and impartial jury were violated. Under these circumstances, Defendants must receive a new trial where the jury will hear the evidence afresh without the impact of extraneous influence or time.

Respectfully submitted,

/s/ John-David Thomas
John-David Thomas (BPR # 027582), *pro hac vice*
L. Wells Trompeter (BPR # 030380)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
jd.thomas@wallerlaw.com
wells.trompeter@wallerlaw.com

*Attorneys for Defendant Katrina Lanier*

/s/ J. Alex Little
J. Alex Little (BPR # 029858)
BURR & FORMAN LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: 615-724-3202
alex.little@burr.com

*Attorney for Defendant Ricky Lanier*

37

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 9, 2019, I electronically filed with the Clerk of the Court using

the CM/ECF system upon:

Anne-Marie Svolto
U.S. Department of Justice (USAO Knox)
Office of U.S. Attorney
800 Market Street, Suite 211
Knoxville, TN 37902
Email: anne-marie.svoloto@usdoj.gov

Donald W. Taylor
U.S. Department of Justice (USAO Greene)
Office of U.S. Attorney
220 West Depot Street
Suite 423
Greeneville, TN  37743
Email: wayne.taylor2@usdoj.gov


/s/ J. Alex Little

38